UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WARREN GANUES and DOMINIC VARRIALE, on Behalf of Themselves and All Others Similarly Situated, | ) ) ) | Case No. |
| | ) | |
| Plaintiffs, | ) ) | CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES |
| | ) | LAWS |
| v. | ) | |
| | ) | |
| WORLD WRESTLING ENTERTAINMENT, INC., VINCENT K. MCMAHON, and GEORGE A. BARRIOS, | ) ) ) | July 24, 2014 |
| | ) | |
| Defendants. | ) | DEMAND FOR JURY TRIAL |

Plaintiffs Warren Ganues and Dominic Varriale ("Plaintiffs"), by their attorneys, submit this Class Action Complaint against the Defendants (as defined herein) named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the securities of World Wrestling Entertainment, Inc. ("WWE" or the "Company") between October 31, 2013, and May 16, 2014, inclusive (the "Class Period"), against WWE and certain of its officers and/or a director for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      WWE is an integrated media and entertainment company that was founded in Stamford, Connecticut in 1980 and focuses on the wrestling entertainment business worldwide. Today, WWE primarily operates in four core segments: Live and Televised Entertainment, Consumer Products, Digital Media, and WWE Studios.   The Company's flagship televised entertainment includes its *Monday Night Raw* and *Friday Night Smackdown* properties which air in the United States on Comcast Corporation's USA Network and Syfy Channel, respectively.

3.      This matter arises out of false and misleading statements about the WWE's much publicized ability to transform the Company's earnings profile through, among other things, the negotiation of a lucrative new long-term television license deal.  This new television deal was supposed to be the "primary driver" of WWE's transformation.  In particular, Defendants caused WWE to issue false and misleading statements in WWE's public filings, press releases, and conference calls that touted the Company's ability to command a fee in its upcoming negotiations to renew its U.S. television license agreement worth double the value of the existing agreement. Defendants claimed that their ability to command a premium fee in WWE's upcoming negotiations to renew its television license agreement by pointing to WWE's high ratings, DVR-proof live

programming, potential to attract multiple bidders, and comparing the Company's new deal to recent license agreements for live sporting events, such as National Association of Stock Car Auto Racing Inc. ("NASCAR").  Notably, NASCAR's recent television license contract is worth approximately $820 million annually.

4.      Simultaneously, Defendants downplayed the fact that advertisers pay less to reach WWE's viewers than traditional sports and any other show on the USA Network and the negative impact on the television license negotiations resulting from the Company's launch of its WWE Network, a 24/7 subscription-based streaming network containing pay-per-view events and original and historical programming.

5.      Defendants, however, could not maintain their ruse concerning the Company's business prospects indefinitely.  WWE was not able to negotiate the lucrative television rights deal that Defendants led investors to expect.  On May 15, 2014, WWE announced that it had reached a multi-year deal with NBCUniversal Cable Entertainment to distribute its *Monday Night Raw* and *Friday Night Smackdown* properties.  Notably absent from the release was any information concerning the value and length of the agreement.  On that same day, after the market closed, WWE issued a press release which provided investors with some insight into the true value of the Company's key content agreements.  The press release revealed that the annual value of all of WWE's key television distribution agreements increased by approximately $92 million, which includes an increase of approximately $57 million for the U.S. market.  Thus, contrary to Defendants' previous statements concerning WWE's ability to double the value of its television license agreement, the actual value increase was only approximately 50%.  When the Company revealed the truth about the value of its new distribution deal, WWE's stock price plummeted to $11.27 per share on May 16, 2014, a decline of 43% from a previous day closing price of $19.93 per

share.

## JURISDICTION AND VENUE

6. The claims asserted herein arise under section 10(b) and section 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5.

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, 15 U.S.C. §78aa.

8. Venue is proper in this District pursuant to section 27 of the Exchange Act and 28 U.S.C. §1391(b).

9. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

## THE PARTIES

10. Plaintiff Warren Ganues purchased securities of WWE during the Class Period as set forth in the attached certification hereto and was damaged as a result of Defendants' wrongdoing as alleged in this Class Action Complaint.

11. Plaintiff Dominic Varriale purchased securities of WWE during the Class Period as set forth in the attached certification hereto and was damaged as a result of Defendants' wrongdoing as alleged in this Class Action Complaint.

12. Defendant WWE is a Delaware corporation with principal executive offices located at 1241 East Main Street, Stamford, Connecticut. Defendant WWE is an integrated media organization and recognized leader in global entertainment, with a portfolio of businesses that create and deliver

original content fifty-two weeks a year to a global audience via television programming, pay-per-view, digital media, and publishing platforms.  The Company's operations are centered around the following four business segments: (i) Live and Televised Entertainment, consisting of ticket sales to live events, sales of merchandise at these live events, television rights fees, integrated sponsorships fees, and fees for viewing pay-per-view and video-on-demand programming; (ii) Consumer Products, consisting of sales of WWE produced home entertainment, magazine publishing, and royalties or license fees related to various WWE themed products such as video games, toys, and apparel; (iii) Digital Media, consisting of advertising sales on the Company's websites, rights fees received for digital content, sales of merchandise through WWEShop internet storefront, and sales of various broadband and mobile content; and (iv) WWE Studios, consisting of amounts earned from the distribution of filmed entertainment.

13.     Defendant Vincent K. McMahon ("McMahon") is WWE's Chairman of the Board and has been since 1980 and Chief Executive Officer ("CEO") and has been since September 2009. Defendant McMahon co-founded WWE.

14.     Defendant George A. Barrios ("Barrios") is WWE's Chief Strategy & Financial Officer and has been since November 2013 and Chief Financial Officer ("CFO") and has been since March 2008.

15.     The Defendants identified in ¶¶12-14 are sometimes collectively referred to herein as the "Defendants."  The Defendants identified in ¶¶13-14 are sometimes collectively referred to herein as the "Individual Defendants."

### FALSE AND MISLEADING STATEMENTS

16.     The false and misleading statements began on October 31, 2013, when the Company issued a press release announcing its financial results for the quarter ended September 30, 2013

("2013 Third Quarter").    The press release touted a 9% increase in revenue and an adjusted

operating income increase of 104% to $10.2 million, adjusted operating income before depreciation

and amortization ("OIBDA") increase of 62% to $16.7 million and adjusted net income increase of

100% to $7.0 million, excluding the impact of certain film impairments.   In the press release,

defendant McMahon emphasized the importance of the size of the Company's national television

audience in comparison to the "other sports and entertainment programs."  Moreover, defendant

McMahon confirmed the importance of the television license agreement in WWE's growth strategy

of "doubl[ing] or tripl[ing] our 2012 OIBDA results of $63 million by 2015."  The press release

stated, in relevant part:

**WWE® Reports 2013 Third Quarter Results**

**STAMFORD, Conn., October 31, 2013** - WWE (NYSE:WWE) today announced
financial results for its third quarter ended September 30, 2013. Revenues increased
$9.1 million or 9%, to $113.3 million from $104.2 million in the prior year quarter
driven by a significant increase in rights fees from the licensing of television content.
Operating income decreased 36% to $3.2 million as compared to $5.0 million in the
prior year quarter as revenue growth was more than offset by increased movie losses
due to a $7.0 million impairment charge primarily associated with the Company's
2010-2012 film release slate, and reduced profits from the Company's pay-per-view,
video game and home entertainment businesses. Net income was $2.4 million, or
$0.03 per share, as compared to $3.5 million, or $0.05 per share, in the prior year
quarter. Excluding the impact of film impairments, Adjusted Operating income
increased 104% to $10.2 million, Adjusted OIBDA increased 62% to $16.7 million
and Adjusted Net income increased 100% to $7.0 million.

"During the third quarter, our achievements were highlighted by the production and
monetization of new content, including the original series, *Total Divas*, the expansion
of pay-per-view distribution on the Sony PlayStation 3 platform, and the formation
of new partnerships with blue-chip sponsors such as General Mills and Kraft," stated
Vince McMahon, Chairman and Chief Executive Officer. ***"These accomplishments
reflect the strength of our brands, including a national television audience that
exceeds the annual reach of most other sports and entertainment programs. This
strength provides a solid foundation for the renegotiation of our TV contracts*** and
the potential launch of a WWE network. Based on our ability to create powerful,
entertaining content and to expand distribution, we strongly believe that we are
poised to transform our business."

*"Given the rising value of live content that has a broad, loyal following, we are confident that we will be able to negotiate our key domestic agreements by the end of April next year and that our efforts, including the potential launch of a WWE network, will keep us on track to double or triple our 2012 OIBDA results of $63 million by 2015,"* added George Barrios, Chief Financial Officer. "As we strive to transform our earnings profile, we believe that our 2013 OIBDA results, excluding the impact of film impairments, will fall within the previously communicated range of $40- $50 million."

17.     That same day, in an earnings conference call for the 2013 Third Quarter, defendant Barrios reassured investors regarding the Company's progress toward achieving its strategic goals by touting WWE's negotiations for its television license agreements.  Defendant Barrios stated that "[w]e are confident that the rising value of content in the marketplace, and the potential launch of a WWE network will keep us on track to double or triple our 2012 OIBDA results by 2015."  By making these false and misleading representations, defendants Barrios and McMahon assured investors of the Company's ability to command a premium price for its television license agreement. The conference call went as follows, in relevant part:

**Vince McMahon** – *World Wrestling Entertainment, Inc*. – *Chairman, CEO*

* * *

We are currently in discussions, many of you know that our largest television agreements come due not only just here in the States, but also in the United Kingdom, and we currently are negotiating a window with BskyB, our distributor over in the United Kingdom, which is a very big partner of ours. India is coming up shortly thereafter. *So a lot of these are becoming due, and we are actively pursuing all of them going forward. So we pretty much think that all of these initiatives are, if all of the stars line up and we believe that they will, and we are working hard to make sure that happens, then our business is going to be transformed as we know it now.* So George.

* * *

**George Barrios** - *World Wrestling Entertainment, Inc*. – *CFO*

* * *

Now looking ahead. We believe the investments we are making in our brands and content will maximize WWE's future earnings. *We are confident that the rising*

*value of content in the marketplace, and the potential launch of a WWE network will keep us on track to double or triple our 2012 OIBDA results by 2015.* If we are unable to execute our strategic initiatives in a way that places on a path to achieve these goals, then management will undertake some form of restructuring to increase profitability. Over the coming months we expect to renegotiate our four largest television agreements in the US, the UK, and India. Moreover, we expect to negotiate our key domestic agreements by the end of next April.

*Benchmarking our rights fees to the fees paid for sports programming and other original scripted series indicates that our license agreement has significant upside potential. Recent deals such as NASCAR with NBC Sports reinforce our view that the proliferation of distribution alternatives is driving up the value of content, especially compelling content with broad appeal. WWE shares the key determinants of value that are attributed to live sports.* Significant first run hours and associated gross rating points, a passionate and loyal fan base, and 90% live plus same day viewership which makes WWE content like sports DVR-proof.

The potential launch of a WWE network is another major source of future earnings growth. Our market research and analysis indicate that potential for a meaningful subscriber base and a significant economic opportunity. This opportunity is comparable whether the network is distributed through traditional cable, satellite, and telco partners, or through over the top digital distribution. As we execute on our growth strategy, we will measure our performance against several key milestones over the next 6 to 9 months. These include making progress on our TV rights renewals, and completing network distribution agreements, as well as developing digital products and continued improvement of our movie portfolio. While our results in the near term may be challenged, we are committed to establishing a firm platform for meaningful unprecedented earnings growth.

*Based on the execution of our strategy, which takes advantage of this rising value of content, we are confident that we can generate economic returns to better reflect WWE's tremendous global appeal and brand strength.*

18.    However, due to the low advertising rates for professional wrestling, WWE's core audience compared to other live sports, and the cannibalization of television revenue created by the upcoming launch of the Company's WWE Network, the Company would not be able to capitalize on its "broad and loyal" following in its negotiations for a new television license deal.   The press release overstated both the value of WWE's core audience and understated the impact of its WWE Network on the negotiation of its key domestic agreements.

19.     On December 10, 2013, defendant Barrios participated in the UBS Global Media and
Communications Conference, where he again raised investor expectations concerning the value of
the upcoming television license agreement by comparing WWE's televised content to that of
NASCAR.  Defendant Barrios dramatically overstated the potential value of the television license
agreement and emphasized the importance of the agreement on the Company's transformational
strategy.  Defendant Barrios stated, in relevant part:

> The second thing we've talked about is the renewal of our four largest agreements
> around the world. Two here in the US, one in India, and one in the UK. We said all
> those agreements will be new no later than January 2015, and that, in fact, we're in
> the process of negotiating right now.
>
> We've also said that the two in the US we believe will be finalized, negotiated by the
> end of April 2014, so well within our sight. The new deal won't start then, it will start
> towards the end of the year, but the negotiations will be done, which would allow us
> to announce where we're at. And it's a real significant opportunity.
>
> Today our global TV licensing, media licensing revenues are about $140 million.
> Those four agreements represent, roughly, $100 million.
>
> I want to talk about why we think there is such an opportunity, and I'm going to focus
> on the US because it's, by far, the largest market for us and for everyone on content
> monetization. The lower half of the page is a calculation that takes the license fees
> generated by these properties – and this is a money page.
>
> ***It takes the license fees driven by these properties and essentially compares it to the
> viewership driven by the property. So I'll do a little quick math. Let's take
> NASCAR, it's one of my favorites.***
>
> ***NASCAR did about 330 hours of programming last year. They averaged about 3
> million viewers across those 300 hours, so do that multiplication, it's about 940
> million viewer hours, the total [in prescient]. Their contracts, their average annual
> value of their deals are about $820 million. So I mentioned ours are less than $100
> million for those four deals. So they're at $820 million.***
>
> ***So let's take that and compare it to the WWE. NASCAR did 334 hours, WWE did
> 314. NASCAR averaged about 3 million, WWE averaged about 3.7 million -- so
> 20% more viewers than NASCAR did.***
>
> ***They're at 800, we're at some number around 100. That's why we think this is a
> massive opportunity for us. Does that all get made up in one renewal cycle? Don't
> know. What I do know is live content today is incredibly valuable. All these***

*properties are signed up for the long term other than the NBA and WWE, which are the ones coming up -- real opportunity.*

\* \* \*

And we believe, with some success across those, we double or triple our 2012 OIBDA and get to $120 million to $190 million. Internally, that's what we're shooting for.

A homerun in either of the first two gets you there alone. Three or four million subs on a network gets you there alone. ***Get halfway between where we are today and where NASCAR is gets you there alone****. Some success on both will look and feel pretty good.

20.    On January 14, 2014, in a conference call organized by the Company to discuss the launch of its WWE Network, defendant McMahon attempted to reassure investors that the Company could still command a premium fee in its upcoming negotiations to renew its television license agreement in the United States, despite the potential "cannibalistic" impact the introduction of the WWE Network would have on the value of the Company's television properties.  In fact, defendant McMahon indicated that the new venture would ***increase*** its television ratings, and therefore the value of the assets.  The conference call went as follows, in relevant part:

**Daniel Moore** - *CJS Securities - Analyst*

You mentioned during the prepared remarks that the launch of the Network, you believe, would increase viewership of the Raw and SmackDown -- the traditional TV outlets for NBCU and Syfy. Given the fact that you will be rebroadcasting some of those programmings, just maybe elaborate on why the launch of the Network wouldn't be somewhat cannibalistic to your -- potentially cannibalistic to your current audience base for those key properties?

**Vince McMahon** - *WWE - Chairman and CEO*

Well, the idea is live, and that's the value of our output deals. It's live live. So Monday Night Raw is live. And that's the huge advantage that NBCU sees in WWE, as well as other providers. They see the value of live.

And so -- if you will note, there is no repeats of Monday Night Raw in any form whatsoever on USA. The reason for that is, again, it's the live value that means that much to them.

And by the way, this is not something that is just a WWE point of view. This is also a USA point of view. Having discussions, obviously, with management there, they too -- the network, USA, they too believe this is going to increase television ratings. When we take some of our legacy footage, we take some of the things that we are currently going to do, even some of the pay-per-view, you drop it back into Monday Night Raw, drop it back into SmackDown.

Not to the extent that you don't have the Network, but it's samples. It shows the breadth and depth of our programming and what we can do. Reality shows, things of that nature, that are already in the can. So it will increase the overall awareness of WWE exponentially, thus increasing the interest and overall television ratings. So again, it's not just a WWE view. This is a USA view as well.

21.      On February 20, 2014, the Company issued a press release announcing its 2013 fourth quarter ("2013 Fourth Quarter") and full year financial results for the period ended December 31, 2013.  For the quarter, the Company reported total revenue of $118.4 million as compared to $115.1 million for the same quarter the prior year, and an operating loss of $12.2 million compared to a gain of $2.6 million in the fourth quarter of 2012.  WWE also reported a decrease in OIBDA for the 2013 Fourth Quarter to a $5.6 million loss from income of $8.5 million in the prior year quarter. In the press release, defendant Barrios reiterated that WWE would command a premium fee in its upcoming negotiations to renew its television license agreement.   The press release stated, in relevant part:

**WWE® Reports 2013 Fourth Quarter and Full Year Results**

**STAMFORD, Conn., February 20, 2014** - WWE (NYSE:WWE) today announced financial results for its fourth quarter ended December 31, 2013. Revenues totaled $118.4 million as compared to $115.1 million in the prior year quarter. Operating loss was $12.2 million as compared to income of $2.6 million in the prior year quarter. Net loss was $7.9 million, or $0.10 per share, as compared to income of $0.6 million, or $0.01 per share, in the prior year quarter. OIBDA in the fourth quarter 2013 decreased to a $5.6 million loss from income of $8.5 million in the prior year quarter.

The decline in OIBDA and Operating income was primarily attributable to increased investment in staffing, talent and marketing to support our strategic content initiatives, including the launch of *WWE Network*. Lower sales of new DVD releases and a corresponding shift in product mix to lower priced catalog titles, as well as compressed television production margins that derived from changes in the mix of programming also contributed to the year-over-year decline.

"During the past year, we laid the foundation for future growth and enhanced our brand strength," stated Vince McMahon, Chairman and Chief Executive Officer. "We have now announced the renewal of our television distribution agreement in the U.K., are continuing the negotiations regarding our domestic content, and are poised to launch our global *WWE Network* in the next few days. With preparations for *WrestleMania 30* fully underway, we look forward to celebrating our enduring legacy and ushering in a new era as we blaze new trails in the media industry."

"As we prepared to transform our business, we invested in content production and talent. Although our earnings declined in 2013, our performance was in-line with our guidance, which targeted a range of OIBDA results, excluding film impairments, of $40 million to $50 million," added George Barrios, Chief Strategy & Financial Officer. "Regarding our domestic TV licensing agreements, we are now engaged with potential partners after exiting our exclusive negotiating period with NBCU. ***Based on our analysis of the value of comparable programs and our extensive research regarding consumer interest in WWE Network, we continue to believe that we can double or triple our 2012 OIBDA results of $63 million by 2015.***"

22.     That same day, the Company held an earnings conference call for its 2013 Fourth Quarter financial results.  During the conference call, defendant Barrios stated that the television license agreement had "meaningful upside potential" and compared the Company's programming to other benchmark sports programming like the NFL, NBA, NHL, and NASCAR.   The conference call went as follows, in relevant part:

**George Barrios** - *World Wrestling Entertainment Inc. - Chief Strategy Officer, CFO*

Now looking ahead, based on our analysis of the value of RAW and SmackDown compared to other benchmark programs and extensive research regarding consumer interest in our WWE Network, we continue to believe that we can double or triple our 2012 OIBDA results by 2015. Our programs share the key determinants of value that are attributed to live sports, significant first run hours, and the associated gross rating points, a passionate and loyal fan base and 90% live plus same day viewership, which makes WWE content like sports DVR-proof. Benchmarking our rights fees to the fees paid for sports programming and other original scripted series indicates that our license agreements could have meaningful upside potential.

* * *

**Mike Hickey** - *Benchmark - Analyst*

I'm guessing this is fairly sensitive, but on the NBCU deal, can give us any color as just some regards to why you were not able to reach an agreement? And do you

- 11 -

think that, that the media buyer paying a lower CPM theoretically for the content was a factor?

**George Barrios** - *World Wrestling Entertainment Inc. - Chief Strategy Officer, CFO*

Yes, Mike, I don't want to characterize any of the discussions we've had including with NBCU. As I have said before, right behind the NFL and NBA comes WWE in terms of generating live gross rating points in the US. So that's ahead of NASCAR, ahead of NHL, it is ahead of Major League Baseball, and all their national deals. So we feel good about the value that we bring to a partner both in advertising, being able to drive their CPM as well as and more importantly in the value to their affiliate revenue streams.

23.     On February 28, 2013, the Company issued a press release announcing its "Business Growth Plan and Potential Path to Significant Earnings Growth."  The press release outlined the Company's "plan to transform" WWE, emphasizing, among other things, the "primary" role the renewal of the television license agreement would have in the strategy to double or triple OIBDA by 2015.  Further, the press release emphasized the number of viewers enjoyed by the Company's flagship programs while remaining silent as to the value of those viewers to potential advertisers. The press release also stated the Company's belief in the propriety of equating its content to that of "the rising value of sports programming" for gauging the value of its upcoming television license agreement.  The press release stated, in relevant part:

### **Foundation for Growth: Powerful Global Brands and Rising Value of Content**

Leveraging our global brand strength is a key pillar of our long-term strategy. Audience measures such as the magnitude of our social media followers and the consistent top ratings of our television programs demonstrate WWE's brand strength. In 2012, the average number of viewers of our *Raw* and *SmackDown* programs exceeded the average number of primetime viewers for all cable networks and historically, our programs have ranked as the number one show on their respective networks. Further, our consumer research indicates a high proportion of U.S. and international TV viewers have an affinity for WWE content. This research indicates that in the U.S., approximately 34% of digital multi-channel TV households have an affinity for WWE content (i.e., 31 million homes), one quarter of which (8 million homes) are characterized as very passionate fan households. Our research also indicates that an additional 18% of U.S. digital multi-channel TV households, or 16

million homes, include lapsed fans that we have the potential to re-engage with our content.

*Trends in the cable industry support our belief that owning and monetizing WWE content has significant upside potential*. Industry data shows that the value of content, as measured by network advertising and consumer paid subscriptions, has steadily increased and is expected to rise further across global markets. *We believe that benchmarking the license fees of our content to other original programs and recognizing the rising value of sports programming rights are both indicative of our potential to garner increased revenue from our content*.

### REASONS THE STATEMENTS WERE FALSE AND MISLEADING

24.     The true facts, known by Defendants but concealed from the investing public during the Class Period were:

(a)     WWE's ability to command premium pricing for its television license agreement was significantly undermined by the Company's rollout of the WWE Network;

(b)     WWE's ability to command premium pricing for its television license agreement was significantly undermined by the low advertising rates for professional wrestling compared to other live sports; and

(c)     As a result of the foregoing, there was no reasonable expectation that WWE could double the value of its domestic television license agreement.

### THE TRUTH IS REVEALED

25.     On May 15, 2014, the Company announced that it had reached a multi-year deal with NBCUniversal Cable Entertainment to distribute its *Monday Night Raw* and *Friday Night Smackdown* properties.  Notably absent from the release was any information concerning the value and length of the agreement.

26.     On that same day, after the market closed, WWE issued a press release which provided investors with some insight into the true value of the Company's key content agreements. Contrary to Defendants' previous statements concerning WWE's ability to double the value of its

U.S. television license agreement, the press release revealed that the annual value for all of WWE's television license agreements was approximately $200 million, an increase of $90 million over the previous deal. That represents an increase of approximately $57 million, 50%, for the U.S. market, rather than the doubling, or greater, that investors had been led to expect. The press release stated, in relevant part:

### Renewal of Key Television Agreements

Over the past six months, the Company has negotiated television distribution agreements in the U.S., U.K. and Thailand, and is in the midst of discussions regarding the distribution of WWE content in India. The Company estimates that it will increase the average annual value of these key television agreements to approximately $200 million, representing an increase of more than $90 million that is nearly three times (3x) the increase achieved in the previous round of negotiations.

* * *

Management believes that the new agreements more fully reflect the value of WWE content, including significant first-run hours, a passionate and loyal fan base, and 90% "live plus same day" viewership in the U.S., which makes WWE content, like sports, "DVR-proof." The Company plans to capitalize on the value of WWE content to drive further increases in value in other international markets.

27.     On May 19, 2014, the Company held a conference call to discuss its business outlook with investors. During this conference call, defendant McMahon admitted that the February 2014 launch of the WWE Network had a negative impact on the television license negotiations. The conference call went as follows, in relevant part:

**Vince McMahon** - *World Wrestling Entertainment, Inc. – Chairman & CEO*

* * *

As all of you know, we announced our television deal with NBC last Friday, and at the same time, tried to -- whether we failed or not I'm not quite certain, but tried to give you a degree of transparency as far as our network is concerned, the WWE Network. And maybe we gave you too much information, or maybe not enough, I'm not quite certain.

But in the interest of transparency, that's why we're having this call, to clear up some degree of perhaps misunderstanding of what we're trying to do. We've always prided

ourselves on being transparent, and hopefully today, we can give a little bit more light along those lines.

As far as our television deals are concerned, we are, well, there's a somewhat favorable outcome I should say. We were a little disappointed in our NBCU deal quite frankly, but when you add up all of our larger television deals, we nearly doubled our prior deal, so we're at about $200 million.

So internationally, we did much better than we did domestically, but when you add them up, it's not too bad when you double your television deals.

Again, not what we wanted, and not what our research showed us, well actually internationally it did, and we hit those margins, but not so much domestically. But still a good deal, not what we wanted.

* * *

**Daniel Moore** - *CJS Securities – Analyst*

* * *

***You've maintained, obviously, that the launch of the network would not cannibalize viewership, and would not impact negatively your negotiating position for the TV rights in North America with NBCU. With hindsight, was the launch of the network a sticking point for your current and potential cable partners, and would you have considered delaying it, if you had to do it over again?***

**Vince McMahon** - *World Wrestling Entertainment, Inc. - Chairman & CEO*

That's a very fair question. I'll answer that one. ***I think it definitely had a negative impact.*** How much of it, I don't know, by coming out with the network before we finish negotiating all of our rights.

The other aspect of that is that if we didn't come out with the network when we did, it would take us another year, because the idea there was to come out with the network at the strongest point which would be WrestleMania so it's a chicken and egg kind of situation. I do think, though, that was part of, I don't know if it was a significant aspect, but part of a lighter number, in terms of television rights. So I think that's a fair thing to say.

28.      When the Company revealed the truth about the value of its new distribution deal, WWE's stock price plummeted to $11.27 per share on May 16, 2014, a decline of 43% from a previous day closing price of $19.93 per share, on high trading volume.

**LOSS CAUSATION**

29.     During the Class Period, as detailed herein, Defendants: (i) made false and misleading statements, (ii) engaged in a scheme to deceive the market, and (iii) engaged in a course of conduct that artificially inflated the price of WWE securities and operated as a fraud or deceit on Class Period purchasers of WWE securities by misrepresenting the Company's business and prospects. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of WWE securities fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of WWE securities during the Class Period, Plaintiffs and other members of the Class (as defined herein) suffered economic loss, i.e., damages, under the federal securities laws.

**FRAUD-ON-THE-MARKET DOCTRINE**

30.     At all relevant times, the market for WWE securities was an efficient market for the following reasons, among others:

(a)     WWE securities met the requirements for listing, and was listed and actively traded on the New York Stock Exchange ("NYSE"), a highly efficient and automated market;

(b)     WWE filed periodic public reports with the SEC and the NYSE; and

(c)     WWE regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

31.     As a result of the foregoing, the market for WWE securities promptly digested current information regarding WWE from all publicly available sources and reflected such information in the prices of the securities.  Under these circumstances, all purchasers of WWE securities during the

Class Period suffered similar injury through their purchase of WWE securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

32.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Class Action Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of WWE who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

33.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired WWE securities during the Class Period (the "Class").  Excluded from the Class are Defendants and their families; the officers and directors of the Company, at all relevant times, and members of their immediate families; and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

34.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Pursuant to SEC filings, WWE has over 75 million shares of stock outstanding, owned by hundreds if not thousands of persons.

35.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

       (a)     whether the Exchange Act was violated by Defendants;

       (b)     whether Defendants omitted and/or misrepresented material facts;

       (c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

       (d)     whether Defendants knew or deliberately disregarded that their statements were false and misleading;

       (e)     whether the price of WWE securities was artificially inflated; and

       (f)     the extent of damage sustained by Class members and the appropriate measure of damages.

36.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

37.     Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

38.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### Against Defendants for Violation of Section 10(b) of the
### Exchange Act and SEC Rule 10b-5

39.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

40.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

41.     Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder, in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of WWE securities during the Class Period.

42.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for WWE securities.  Plaintiffs and the Class would not have purchased WWE securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

43.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

44.     The Individual Defendants acted as controlling persons of WWE within the meaning of section 20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause WWE to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled WWE and all of its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

45.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as representatives of the Class;

B.     Awarding Plaintiffs and the members of the Class damages, including interest;

C.     Awarding Plaintiffs reasonable costs and attorneys' fees; and

D.     Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), the plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

Dated: July 24, 2014

THE PLAINTIFFS,

By:  /S/ Mary-Kate Smith

ERIC M. HIGGINS (CT11609)
MARY-KATE SMITH (CT26820)
WOFSEY, ROSEN, KWESKIN
  & KURIANSKY, LLP
600 Summer Street
Stamford, CT 06901
Telephone: (203) 327-2300
Facsimile: (203) 967-9273
E-Mail:higgins@wrkk.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS (ct28404)
DARNELL R. DONAHUE
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
         ddonahue@robbinsarroyo.com

LAW OFFICE OF ALFRED G. YATES,
  JR., P.C.
ALFRED G. YATES, JR.
GERALD L. RUTLEDGE
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: (412) 391-5164
Facsimile: (412) 471-1033
E-mail: yateslaw@aol.com

Attorneys for Plaintiffs

964580

- 21 -